# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JANE AND JOHN DOE, Individually and as the natural parents and next of kin of MINOR DOE, their minor child, et al., | ) ) ) ) | CASE NO. 5:17-cv-1931 |
| PLAINTIFFS, | ) ) | JUDGE SARA LIOI |
| vs. | ) ) | MEMORANDUM OPINION |
| JACKSON LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, et al., | ) ) ) | |
| DEFENDANTS. | ) | |

Plaintiffs Jane and John Doe (collectively, the "Does") individually and as the natural parents and next of kin of Minor Doe ("Minor Doe"), bring this civil rights action against defendants Jackson Local School District ("JLSD") Board of Education ("Board"), Jimmie Singleton ("Singleton"), Susanne Waltman ("Waltman"), Harley Neftzer ("Neftzer"), Tamara Neff ("Neff"), and Michelle Krieg ("Krieg") (collectively, individuals referred to as "JLSD Employees"). Each party has moved for summary judgment. (Doc. No. 61 ["Does MPSJ"]; Doc. No. 63 ["Board MSJ"]; Doc. No. 64 ["JLSD Employees MSJ"].) The dispositive motions are fully briefed and ripe for resolution. (Doc. No. 73 ["Does MPSJ Opp'n"]; Doc. No. 70 ["Board MSJ Opp'n"]; Doc. No. 72 ["JLSD Employees MSJ Opp'n"]; Doc. No. 78 ["Does MPSJ Reply"]; Doc. No. 80 ["Board MSJ Reply"]; Doc. No. 79 ["JLSD Employees MSJ Reply"].)

## I. PRELIMINARY MOTIONS

Before the Court can reach the merits of the substantive motions, it must address two preliminary motions raised by the Does. First, the Does seek an order striking the affidavits of

Neftzer and Waltman, claiming that the affidavits contain information that contradicts prior deposition testimony offered by these individuals. (Doc. No. 68 (Motion to Strike Affidavits ["Mot. Strike Aff."]).) The Board and JLSD Employees oppose the motion, insisting that the subsequent affidavit averments merely elaborate or supplement testimony these individuals gave during their depositions. (Doc. No. 76 (Opposition to Motion to Strike Affidavits ["Mot. Strike Aff. Opp'n"]) at 2348.[1])

It is well settled that a party may not contradict earlier deposition testimony by subsequently offering an inconsistent affidavit. *See Lockard v. Gen. Motors Corp.*, 52 F. App'x 782, 789 (6th Cir. 2002) (citing, among authority, *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997)). Having reviewed the briefing and the underlying discovery, the Court finds that the cited testimony is either not contradictory, or contains minor factual inconsistencies that have no bearing on the issues presented in the dispositive motions. Nonetheless, in an abundance of caution, the Court will disregard those portions of the affidavits of Neftzer and Waltman that can be viewed as potentially inconsistent with earlier deposition testimony. Therefore, the Does' motion to strike the affidavits is GRANTED IN PART.

Second, the Does request that the Court strike the replies of the Board and JLSD Employees offered in support of their respective motions for summary judgment, noting that each brief exceeds the permitted page limit. (Doc. No. 83 (Motion to Strike Replies ["Mot. Strike Replies"]).) On August 21, 2018, the Board and JLSD Employees sought leave to exceed the page limitations on their motions for summary judgment. The Court subsequently granted the motion in a non-document order providing that "[a]ll summary judgment motions may exceed

---

[1] All page numbers are to the page identification number generated by the Court's electronic docketing system.

the local rules limitation by 15 pages. All response briefs may exceed the local rules limitation by 10 pages." (Non-Document Order, dated 8/23/2018.) Each defense reply brief exceeded 20 pages.[2] The Board and JLSD Employees insist that they reasonably interpreted the Court's language "[a]ll response briefs" to include reply briefs. They argue that, according to this interpretation, their reply briefs comply with the Court's grant of leave. (Doc. No. 84 (Motion to Strike Replies ["Mot. Strike Replies"]) at 3040.)

Given that Local Rule 7.1(f) draws no distinction between response and reply briefs— and, in particular, does not provide a separate page limitation in the first instance for reply briefs—the Court accepts defendants' collective interpretation of the Court's non-document order as reasonable. While the better course would have been to ask the Court for clarification before filing a reply brief that clearly exceeded the limitation set forth in the local rules, the Court finds no basis to grant the Does' motion. Moreover, as is often the case with reply briefs, the Court notes that the reply briefs filed by *all* parties in this action largely repeat arguments raised in the initial motions and are of only limited assistance. Accordingly, the Court finds that the Does will not be prejudiced by declining to permit them to provide further briefing on these dispositive motions. The Does' motion to strike defendants' reply briefs is DENIED.

## II. BACKGROUND

During the 2016-2017 school year, Minor Doe was a five-year old kindergarten student attending Strausser Elementary, a school located in the JLSD. C.T. was an eleven-year old fifth grade student who also attended Strausser. It is undisputed that over the course of several weeks

---

[2] The Does suggest that the local rules limit all reply briefs, barring leave of court, to fifteen pages. This is incorrect. Local Rule 7.1(f) limits all memorandum relating to dispositive motions in standard track cases to twenty pages. The fifteen-page limitation is reserved for memorandum relating to non-dispositive motions. *See* L.R. 7.1(f).

between the end of October and the middle of November 2016, C.T. performed multiple sexual acts on Minor Doe and made Minor Doe perform sexual acts on him while the two rode a JLSD bus on their way home from school.

*Bus Drivers, Routes, and Seating Charts*

In fact, the parties agree as to most of the salient facts surrounding these unfortunate and disturbing events. During this same period, Singleton was employed by JLSD as a bus driver, and he was assigned to Minor Doe and C.T.'s bus route. (Doc. No. 63-1 (Affidavit of Harley Neftzer ["Neftzer Aff."]) ¶ 9.) The main function of a JLSD bus driver is to operate his vehicle safely. (*Id*. ¶ 4.) Bus drivers are required to attend training provided by the Ohio Department of Education ("ODE"), the school district, and the Stark County Educational Service Center ("Stark County ESC"). (*Id*. ¶ 5; *see* Doc. No. 57-1 (Deposition of Jimmie Singleton ["Singleton Dep."]) at 625–31.) In addition to bus safety, training topics include a variety of student-related issues, such as pupil management and the accommodation of special needs. (Neftzer Aff. ¶ 5(a).) Singleton, however, received no training relative to sexual harassment or sexual abuse. (Singleton Dep. at 604.) Though he received a "satisfactory" rating as to pupil management in his 2015 performance appraisal, the record demonstrates that, within a year of the incidents giving rise to this litigation, Waltman, Strausser's Building Principal, received parent complaints regarding Singleton's pupil management on his routes.[3] (Doc. No. 56-1 (Deposition of Harley Neftzer ["Neftzer Dep."]) at 481–83.)

As the Director of Transportation & Safety, Neftzer was responsible for developing the

---

[3] There was also evidence in the record that, in 2012, Singleton was involved in a traffic accident while operating a JLSD van. (Singleton Dep. at 616–18.) He was cited for failing to yield. (*Id*.) While he received no discipline or additional training following the accident, there is nothing in the record to suggest that Singleton was operating his bus in an unsafe manner during the incidents involved herein.

bus routes prior to the start of each school year. (Neftzer Aff. ¶¶ 3, 6.) After the routes are established and the bus drivers are assigned, bus drivers are provided with copies of information pertaining to students, times, calendars, routes, and vehicle assignments. (*Id.* ¶ 7.) With respect to students, bus drivers receive a route sheet that lists each student's name, address, age, and grade level. (*Id.*; Singleton Dep. at 636–37.) Bus drivers use this information to become familiar with the students assigned to their routes and to create seating charts. (Neftzer Aff. ¶ 7; Singleton Dep. at 637-38.)

When developing seating charts, bus drivers are encouraged to assign students according to age and gender, with younger students sitting together in the front of the bus, and older students sitting in the back of the bus. (Neftzer Aff. ¶ 7; Singleton Dep. at 636; Neftzer Dep. at 514–15.) The primary purpose of grouping the students by age and gender is that topics of discussion differ between different age groups, and older students may discuss topics that are not suited for younger students. (Neftzer Dep. at 514–15; Neftzer Aff. ¶ 7.) Copies of completed seating charts are maintained by the Department of Transportation ("DOT"). (Neftzer Aff. ¶ 7.)

Throughout the school year, it may be necessary to move a student to a different seat for a variety of reasons, including behavioral problems and conflicts between students. (Neftzer Aff. ¶ 8.) Given that bus drivers generally lack the authority to discipline students, a bus driver that identifies a need for a student seat reassignment must submit a referral directed to the DOT or the building principal. (Neftzer Aff. ¶ 8; Doc. No. 63-2 (Affidavit of Susanne Waltman ["Waltman Aff."]) ¶ 4.) The building principal generally conducts an investigation relative to the request—which may entail discussions with the DOT, interviews of students and drivers, and review of bus video surveillance—after which, the building principal determines the appropriate

course of action. (Waltman Aff. ¶ 4; Singleton Dep. at 632–34; Neftzer Aff. ¶ 8.) Depending on the violation, the building principal may place the offending student in detention or an alternative day assignment, suspend his bus riding privileges or move his seat to the front of the bus or to some other seat, suspend him from school, or recommend expulsion. (Waltman Aff. ¶ 4.)

*Match Lighting Incident*

On September 15, 2016, Dean of Students Krieg received a call from C.T.'s teacher that a student had reported that C.T. lit a match on the school bus during the afternoon bus route the day before. (Doc. No. 63-3 (Affidavit of Michelle Krieg ["Krieg Aff."]) ¶¶ 2, 5.) Krieg contacted Neff, a guidance counselor, and the two spoke with another student who confirmed the incident, noting that C.T. lit a match, blew it out, and threw it out the bus window. This second student also indicated that, when she stood up to report the incident to Singleton, C.T. blocked her seat. (*Id*. at ¶ 5.) Video surveillance confirmed the incident, including that C.T. lit a match and threw it out the window. (*Id*.)

Shortly after meeting with the second student, Krieg removed C.T. from class, took him to the school office, and spoke with him concerning the incident. During this conversation, Neff searched the boys' bathroom and found matches in a trash can, and a search of C.T's backpack revealed cardboard. C.T. conceded that he had thrown the matches away in the boy's bathroom. C.T. maintained that another student had supplied him with the matches, and he admitted that he lit a match on the bus and blew it out before throwing it out the window. (*Id*.) A subsequent interview of a third student revealed that C.T. was lighting matches and burning cardboard and grass at the bus stop the morning of September 14, 2015. One of the students interviewed also reported that C.T. told him that he would not bother the student for the rest of year if the student

did not tell anyone about the matches. (*Id.*)

Krieg and Neff reported the results of their information gathering efforts to Waltman. (Krieg Aff. ¶ 5.) Waltman spoke with C.T., while Neftzer reviewed the video surveillance. (Waltman Aff. ¶ 7.) Neftzer reported that the video footage captured and confirmed the misconduct. (*Id.*; Neftzer Dep. at 475–76.) Waltman also contacted C.T.'s parents and informed them that C.T. would be placed in an alternative day assignment for the remainder of the day. (Waltman Aff. ¶ 8.) After an in-person meeting with C.T. and his parents, Waltman determined that C.T. had violated the student conduct code and that he would remain in an alternative day assignment and be prohibited from riding the bus from September 15, 2016 through September 23, 2016. Waltman then developed a "Safety Plan" to address C.T.'s misconduct and to prevent future problems. As part of this plan, upon C.T.'s return to the bus, Waltman determined that C.T. would be required to sit in the front seat of the bus for the remainder of the school year. (Waltman Aff. ¶ 9(a).) Waltman then spoke with Singleton regarding the match lighting incident and the change in C.T.'s seat assignment. (*Id.*; Waltman Dep. at 866–67.) Neftzer also spoke with Singleton to confirm that he understood C.T's bus consequences. (Neftzer Dep. at 495.)

Waltman also placed certain building restrictions upon C.T. (Waltman Aff. ¶ 9(b).) According to these restrictions, C.T. was to be escorted off the bus each morning and brought to the main office by a staff member, his backpack was to be searched, he was to be escorted to his classes by an adult, he was limited to the black top of the playground during recess, and he was to be given assigned seats in gym, music and during library time. (Waltman Aff. ¶ 9(b); Waltman Dep. at 867–68.)

According to the Board and JLSD Employees, these measures represented the first time

C.T. was disciplined while attending Strausser. The Does disagree, citing to the fact that, shortly after he enrolled at Strausser in the third grade, C.T. was placed on a "Success Plan." Though the parties dispute whether this plan was disciplinary in nature, the record establishes that the impetus for the plan was teacher reports that C.T. was taking other student's property, such as glue sticks, and not being truthful about it. His teacher also reported that C.T. was having difficulty following her directions. (Doc. No. 59-1 (Deposition of Tamara Neff ["Neff Dep."]) at 1015–20.) Working with C.T.'s teacher, Neff designed the Success Plan to help C.T. make better choices in the classroom. (*Id.*) The Success Plan remained in effect for the balance of the year, but C.T. was not placed on a new plan for fourth or fifth grade, and Neff received no further complaints regarding C.T.'s behavior until the match lighting incident in 2016. (*Id.* at 1026.)

*The Sexual Assaults on Minor Doe and Defendants' Response*

Upon his return to the bus on September 26, 2016, C.T. was assigned to sit in the front seat of the bus to the right of Singleton. (Singleton Dep. at 669; *see* Waltman Aff. ¶ 9(a).) Another male student had previously been assigned to sit in the seat since the beginning of the 2016–2017 school year and continued to sit in that seat with C.T. (Singleton Dep. at 658.) Minor Doe had been assigned to sit in the seat directly behind Singleton (and across from C.T.'s new seat) since the beginning of the school year. (*Id.*) Minor Doe would sit with another female kindergarten student on the morning bus ride to school, but the other kindergarten student did not ride the bus in the afternoon, leaving the seat next to Minor Doe vacant during the ride home. (*Id.* at 658–60.) Given its location directly behind the driver's seat, Minor Doe's seat afforded the worst visibility for the driver. (*See id.* at 694.)

On Saturday, November 12, 2016, Waltman checked her emails and discovered that she

had received an email from Minor Doe's mother the preceding evening (November 11, 2016) advising that Minor Doe had reported to her parents at dinner that C.T. "did something really gross on the bus this afternoon," and that it was apparent to her parents that Minor Doe had been sexually assaulted multiple times by C.T. (Waltman Aff. ¶ 12.) In the email, Minor Doe's mother indicated that she and her husband had already contacted the police, and that the authorities would be contacting JLSD as well. After advising the Director of Curriculum, Instruction, and Assessment of the allegations, Waltman contacted Neftzer and asked him to acquire the bus video surveillance recordings during the relevant period between October and November 2016. (Waltman Aff. ¶¶ 12, 13.) On Sunday, November 13, 2016, Waltman advised the JLSD Superintendent of the allegations and went into the school office to call Minor Doe's parents to set up a meeting for Monday morning. (Waltman Aff. ¶ 13(a).)

At 6:00 a.m. on Monday, November 14, 2016, Waltman and Neftzer met to review the video footage from the bus runs on November 10, 2016 and November 11, 2016. Their review confirmed the Does' allegations that C.T. had moved to Minor Doe's seat and sexually assaulted her. (Waltman Aff. ¶ 13(b).) Neftzer reviewed the footage again, later that day, with officers from the Jackson Township Police Department ("JTPD"). (Neftzer Aff. ¶ 13.) Waltman and Neftzer subsequently reviewed additional footage for the two-week period between October 31, 2016 and November 11, 2016. (*Id.*)

Waltman contacted C.T.'s parents during the morning of November 14, 2015 to advise them to keep C.T. home and that he had been placed on emergency removal. (Waltman Aff. ¶ 13(c).) Afterwards, at approximately 9:00 a.m., Waltman met with Minor Doe's parents and Neff concerning the allegations, and they were later joined by representatives from the JTPD.

(Waltman Aff. ¶ 13(c).) Minor Doe's parents expressed their concern over the incident and conveyed a request that the matter be kept confidential so as not to impact Minor Doe's well-being at school.[4] (Waltman Dep. at 40.)

The following day (November 15, 2016), Waltman met with C.T.'s parents to discuss the allegations. (Waltman Aff. ¶ 13(d).) On November 16, 2016, Waltman conducted a suspension hearing during which C.T. admitted to engaging in sexual misconduct. (Waltman Aff. ¶ 13(e).) Waltman suspended C.T. for ten days, from November 14, 2016 to December 2, 2016, for violating multiple sections of the student conduct code. (Waltman Aff. ¶ 13(e).) Waltman also recommended that C.T. be expelled. (Waltman Aff. ¶ 13(e).) On November 30, 2016, the JSLD Superintendent conducted an expulsion hearing, and, at the hearing's conclusion, C.T. was expelled. His expulsion was stayed pending possible remediation at a rehabilitative academy. (Waltman Aff. ¶ 13(f), Ex. 3.) It is undisputed that C.T. never rode the bus again with Minor Doe, and C.T. never again came into contact with her.

During the course of JLSD's investigation, Waltman and other school officials interviewed other students on the bus and looked at additional footage to identify other incidents involving Minor Doe or other children. The investigation uncovered twelve occasions where C.T. assaulted Minor Doe and/or inappropriately touched another student. (Doc. No. 70-2.) JSLD also determined that C.T. told a male kindergarten student to look away on multiple occasions

---

[4] Waltman subsequently met with Minor Doe's teachers to see how Minor Doe was doing. (Waltman Aff. ¶ 13(g).) None of her teachers reported any concerns. (*Id*.)

and that he would be paid if he did not report the abuse. (Waltman Dep. at 34.) Additionally, C.T. plied Minor Doe with glitter pens when making her perform sexual acts on him. (Doc. No. 71-1 (Affidavit of Jane Doe ["Ja. Doe Aff."]), and attached exhibit, filed under seal.)

Following JSLD's investigation, Waltman conducted periodic classroom walkthroughs and touched base with Minor Doe's teachers to see how she was doing, and Waltman and Neff remained in contact with Minor Doe's parents. (Waltman Aff. ¶ 13(g).) Waltman also offered counseling for Minor Doe and advised her parents that Neff was available to address any concerns they had. (Waltman Aff. ¶ 13(g).)

JLSD also cooperated with JTPD's investigation. C.T. was eventually charged with and pleaded guilty to gross sexual imposition. The JTPD determined that Singleton had not engaged in any criminal misconduct, and that C.T. had positioned his backpack such that the bus driver would not have been able to see C.T.'s misconduct. (Neftzer Aff. ¶ 14.)

On August 15, 2017, the Does filed the present lawsuit in state court, and the Board and the JLSD Employees subsequently removed the action to federal court. (Doc. No. 1-2 (Complaint); Doc. No. 1 (Notice of Removal).) As amended, the complaint raises claims under 42 U.S.C. § 1983; Title IX of the Educational Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 *et seq.*; political subdivision tort liability under Ohio Rev. Code § 2744.02; negligence and/or reckless conduct; loss of filial consortium; and intentional infliction of emotional distress. (Doc. No. 47-1 (Second Amended Complaint ["SAC"]).)

The Board and JLSD Employees now move for summary judgment, pursuant to Fed. R. Civ. P. 56, on each and every claim asserted against them in the SAC. They also seek statutory immunity for the state law claims asserted under the Ohio Revised Code, and JLSD Employees

assert a right to qualified immunity on the federal claims. The Does oppose these motions and request partial summary judgment in their favor on the claims brought pursuant to 42 U.S.C. § 1983.

### III. STANDARD OF REVIEW

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict[.]" *Id*. at 252.

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (finding that summary judgment is appropriate whenever the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003) (quotation marks and citation omitted). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(2); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988))).

The summary judgment standard does not change when a court is presented with cross-motions for summary judgment. *Profit Pet v. Arthur Dogswell, LLC*, 603 F.3d 308, 312 (6th Cir.

2010) (citing *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)). "The fact that both parties have moved for summary judgment does not mean a court must grant judgment as a matter of law for one side or the other; rather, a 'court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Id.* (quoting *Taft*, 929 F.2d at 248); *see 60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (the threshold requirement for all parties who seek summary judgment under Rule 56 demands that the moving party come forward with competent evidence showing that there is no genuine issue of material fact and that the movant is entitled to judgment in her favor as a matter of law).

## IV. THE BOARD'S MOTION FOR SUMMARY JUDGMENT

### A. § 1983—Substantive Due Process

To establish a cause of action under 42 U.S.C. § 1983, a plaintiff must show: (1) deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law. *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 463 (6th Cir. 2006). The Does argue that the Board and the JLSD Employees, while acting under color of law, deprived Minor Doe of her substantive due process rights when they permitted C.T. to sexually assault her on a JLSD school bus.

The Due Process Clause does not generally impose an affirmative duty on the State to protect its citizens from the violence of third parties. *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989) (The Due Process Clause's purpose is "to protect the people from the State, not to ensure that the State protected them from each other.") In *DeShaney*, the Supreme Court refused to impose municipal liability for parental

abuse a child sustained after officials failed to remove the child from his father's custody. *Id.* at 201. However, in so ruling, the *DeShaney* Court impliedly recognized, and courts such as the Sixth Circuit have endorsed, two exceptions whereby state actors have an affirmative duty of protection—"where they have a 'special relationship' with an individual, or where their conduct toward the individual results in a 'state-created danger.'" *Brooks v. Knapp*, 221 F. App'x 402, 406 (6th Cir. 2007) (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998)).

          1.     <u>Special Relationship</u>

While the SAC purports to raise a claim under the first exception, the Does fail to even respond to the Board's arguments that it had no special custodial relationship with Minor Doe by virtue of her attendance at Strausser Elementary or her presence on a JLSD bus. (*See* SAC at ¶¶ 88-92.) Of course, at the summary judgment stage, the Does were required to venture past their pleadings and offer some developed argumentation as to the validity of their claim. *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997); *see Banks*, 330 F.3d at 892.

Further, it is well-settled that forced or involuntary custody is necessary to establish a special relationship with the State. *Doe v. Claiborne Cty.*, 103 F.3d 495, 510 (6th Cir. 1996); *see Jackson v. Schultz*, 429 F.3d 586, 590 (6th Cir. 2005); *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 911 (6th Cir. 1995) ("A special relationship can only arise when the *state* restrains an individual.") (emphasis in original). However, compulsory school attendance does not create a special relationship between school districts and their students. *Soper v. Hoben*, 195 F.3d 845, 853 (6th Cir. 1999); *Sargi*, 70 F.3d at 911 (collecting cases). Likewise, the Sixth Circuit has determined that transporting students via a school bus does not create a special relationship.

*Sargi,* 70 F.3d at 911. As such, the record simply does not support a finding that there was a special relationship between the Board and Minor Doe.

2.      State-Created Danger

"Liability under the state-created danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." *Kallstrom,* 136 F.3d at 1066. Accordingly, in *Kallstrom,* the Sixth Circuit recognized three elements a plaintiff must satisfy to establish liability under the state-created danger exception: (1) an affirmative act that creates or increases the risk, (2) a special danger to the victim as distinguished from the public at large, and (3) the requisite degree of state culpability. *Id.*; *see McQueen,* 433 F.3d at 464; *Cartright v. City of Marine City,* 336 F.3d 487, 493 (6th Cir. 2003). While the parties dispute the existence of an affirmative act (the first element), the Court finds the absence of the requisite culpability (the third element) dispositive, as the record does not support a finding that the Board and the JLSD Employees "knew or should have known that [their] actions specifically endangered" Minor Doe. *Cartright,* 336 F.3d at 493.

"In determining whether an affirmative state act increased the risk of harm to an individual, the question is whether the individual 'was safer *before* the state action than . . . *after* it." *Jasinski v. Tyler,* 729 F.3d 531, 539 (6th Cir. 2013) (emphases in original) (quoting *Cartwright,* 336 F.3d at 493). The Board argues that, at best, the JLSD Employees were guilty of a "failure to act" by failing to ensure that C.T. did not move from his newly assigned bus seat into the seat next to Minor Doe, and that this omission cannot be considered an affirmative act

under the state-created danger test.[5] (Board MSJ at 1815–17.) By way of analogy, the Board cites several decisions wherein school officials merely failed to take certain actions to prevent harm by a third party and were not liable for a state-created danger. *See, e.g. Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 367 (6th Cir. 2012) (school did not affirmatively place female student in increased risk of harm of sexual assault by warning the student perpetrator against continued sexual harassment of the victim); *McQueen*, 433 F.3d at 466–67 (a teacher who momentarily left students unsupervised did not take an "affirmative act" subjecting the students to violence by another student who had secretly brought a gun school); *Reed v. Knox Cty. Dep't of Human Servs.*, 968 F. Supp. 1212, 1220–22 (S.D. Ohio 1997) (state agency was not responsible for acts committed by a foster child, notwithstanding the fact that the agency failed to inform the foster family of the child's violent history prior to his placement).

The Board's argument fails on two fronts. First, while the Board points to affidavits from various JLSD Employees who aver that they did not instruct C.T. to sit with Minor Doe and were unaware that C.T. was moving his seat, the Does represent, and the Board does not deny, that the bus video footage shows at least one instance where Singleton motioned to C.T. to sit next to Minor Doe. (Board MSJ Opp'n at 2384.) Such a gesture would certainly qualify as an affirmative act. Because the Court must view the evidence in the light most favorable to the non-moving party—here, the Does—the Court finds that a state actor took an affirmative step.

Of course, even without Singleton directing C.T. to sit next to Minor Doe, the Court

---

[5] The Court notes that, in drawing this distinction, the Board relies on *M.S. by Covington v. Hamilton Cty. Dep't of Educ.*, No. 1:16-cv-501, 2017 WL 4364408 (E.D. Tenn. Sept. 29, 2017). However, that decision was recently overturned by the Sixth Circuit. *See M.S. by Covington v. Hamilton Cty. Dep't of Educ.*, No. 17-6241, -- F. App'x --, 2018 WL 5734642, at *5 (6th Cir. Nov. 1, 2018) (finding that a school principal took an affirmative act that increased students' risk of injury from an unsafe bus driver by instructing students to board school bus, notwithstanding the fact that the action was taken in conformance with a school policy).

would still find the existence of affirmative acts that increased the risk of harm to Minor Doe. In *Caldwell v. Louisville*, 120 F. App'x 566 (6th Cir. 2004), a mother sued a city after her daughter was killed by her live-in boyfriend. In reversing the district court's grant of summary judgment for the city on the substantive due process claim, the Sixth Circuit found that the city took some affirmative acts—including failing to follow through with obtaining a warrant against the boyfriend and continuing to pursue criminal charges against the boyfriend—that substantially increased the likelihood that a private actor would harm the victim. *Id*. at 573. Similarly here, viewing the evidence in the light most favorable to the Does, the Court must conclude that the act of moving C.T.'s seat to the front of the bus, in close proximity to Minor Doe's seat, substantially increased the risk that C.T. would harm Minor Doe. Not only did the move place C.T. within one seat of Minor Doe, the record establishes that Minor Doe was sitting in the seat that afforded the worst visibility for the driver. At a minimum, the record supports a finding that Minor Doe was safer *before* C.T.'s seat assignment was changed. This would seem sufficient to satisfy the first prong of the state-created danger test. *See Kallstrom*, 136 F.3d at 1067 (it is enough if "the City's actions . . . substantially increase[ed] the likelihood that a private actor would deprive [the plaintiff] of [her] liberty interest in personal security").

Nevertheless, the Court finds that the Does cannot establish the third prong because they cannot demonstrate that the defendants acted with the "requisite culpability to establish a substantive due process violation under the Fourteenth Amendment." *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002). Only conduct that "shocks the conscience" will be sufficient to establish the requisite culpability. *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 535 (6th Cir. 2008). In situations where there is opportunity for reflection, the

guiding principle is "deliberate indifference," which the Sixth Circuit has equated with "subjective recklessness[.]" *McQueen*, 433 F.3d at 469; *see Wilson v. Columbus Bd. of Educ.*, 589 F. Supp. 2d 952, 962–63 (S.D. Ohio 2008). Under this standard, "the official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference[.]" *McQueen*, 433 F.3d at 469 (quoting *Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 493 (6th Cir. 2002)); *see Wilson*, 589 F. Supp. 2d at 962–63.

The Does argue that C.T.'s prior record should have put the Board and JLSD Employees on notice that C.T. posed a substantial risk of harming Minor Doe. Specifically, they point to the Success Plan instituted for C.T. in the third grade—and the precipitating acts of taking other children's property, lying about the theft, and failing to follow teacher instructions—as well as the recent match-lighting incident. They also highlight the fact that C.T. interfered with a student's efforts to report the match lighting incident as evidence that the Board knew that C.T. had "harassed, intimidated and bullied other students, and engaged in conduct that causes or could cause injury to others . . . ." (Board MSJ Opp'n at 2390.) According to the Does, "by moving C.T. to the front of the bus, knowing he did not follow directions, and leaving him with a single adult who knowingly could not control his students, [the Board] significantly increased the likelihood that C.T. would find the best seat to provide cover, i.e., the one directly behind the driver. These facts, all known to [the Board], satisfy the requisite showing of subjective recklessness to sustain" their substantive due process claims. (*Id.* at 2391.) In advancing this argument, the Does insist that it is not necessary that the Board have appreciated the specific risk that C.T. would sexually assault Minor Doe. (*Id.*) The weight of authority does not support this position.

For example, the Sixth Circuit rejected a similar argument in *Range v. Douglas*, 763 F.3d 573 (6th Cir. 2014). There, the plaintiffs' deceased family members were sexually violated by a county employee at the morgue. Even though the perpetrator's supervisors were aware of his drinking, tardiness, domestic relations charges, and possible sex with living women at the morgue, the court rejected a finding of deliberate indifference. While the court acknowledged that people under the influence have lapses in judgment, "a jury could not conclude that the supervisors were aware of facts from which they could infer a substantial risk *of the kind of serious harm that occurred here*, that they did infer it, and that they acted with deliberate indifference toward the rights of the families involved." *Range*, 763 F.3d at 591–92 (emphasis added) (pointing to the absence of evidence of a "substantial risk that an inebriated person will desecrate a body").

Also, in *McQueen*, a teacher left students unattended in a classroom while she escorted several classmates to the computer lab. Despite the fact that one of the remaining children had a prior history of fighting with other students—"sometimes beating them up and other times stabbing them with a pencil"—the court held that neither the teacher nor the school was deliberately indifferent to the risk that the student perpetrator would shoot the plaintiff with a gun he had secretly brought from home. *McQueen*, 433 F.3d at 462, 469–70. In reaching this conclusion, the court endorsed the district court's deliberate indifference analysis wherein it reasoned:

> [A]lthough [the school official] was aware of [Smith's] disruptive and sometimes violent behavior, no reasonable fact finder could conclude that she knew [Smith] would *use a gun to kill another student* if left unsupervised for a few minutes. Plaintiff does not claim that [Smith] ever specifically threatened to kill or serious injure decedent [Doe] or any other student. Nor does plaintiff claim that prior to February 29, 2000, [Smith] had ever brought a gun or other dangerous weapon to

school. Absent such evidence, it is impossible to conclude that defendant was on notice of a substantial risk to the students left alone in the classroom.

*Id*. at 469–70 (emphasis added).

Similarly, in *Peer ex rel. Doe v. Porterfield*, No. 1:05-cv-769, 2007 WL 9655728 (W.D. Mich. Jan. 8, 2007), the court declined to apply the state-created danger theory in a lawsuit involving student-on-student sexual assault. There, an eighth-grade student perpetrator sexually molested and/or attempted to sexually molest several kindergarten students while serving in the kindergarten classroom as a teacher's aide. In an attempt to establish liability under Title IX[6] and § 1983, the plaintiffs pointed to the perpetrator's poor academic record and previous incidents of misconduct, including leaving his assigned seat on the bus and bullying a student by kicking and hitting her, none of which, the court noted, involved "a prior incident of sexual misconduct or even a tendency or proclivity for such conduct." *Id*. at *4. Observing that the record was devoid of any evidence of sexual harassment by the offending student, the court concluded that no reasonable jury could find that the school district was deliberately indifferent to the risk that the students in question would be sexually molested. *Id*. at *10.

As was the case in *Peer*, there was nothing about C.T.'s school record that could have put the JLSD Employees on notice that he posed a risk of sexually assaulting other students. Even affording the Does every inference as to this past record—and even giving full credence to the Does' belief that C.T.'s conduct included intimidation or "bullying"—nothing about his past suggested a proclivity for sexual misconduct. The Does point to the fact that JLSD Employees imposed severe restrictions on C.T's movements in the building as evidence that they viewed his

---

[6] Liability of a school district under Title IX for sexual abuse of students and liability under section 1983 are "comparable." *Klemencic v. Ohio State Univ*., 263 F.3d 504, 510 (6th Cir. 2001) (citing *Gebser v. Lago Vista Indep. Sch. Dist*., 524 U.S. 274, 291, 118 S. Ct. 1989, 141 L. Ed. 2d 277 (1998)).

actions to be serious. (Board MSJ Opp'n at 2391.) To be sure the match-lighting behavior and other associated conduct was serious, which is why JLSD Employees took action in response to it, including moving C.T.'s seat on the bus. However, serious as this past behavior may have been, the risk that C.T. would sexually assault another student was not so obvious that JLSD Employees should have known about it. *See McQueen*, 433 F.3d at 470. Because no reasonable juror could conclude that JLSD Employees knew or should have known that C.T. would sexually assault Minor Doe if his seat was moved to the front of bus—and even if placed in the seat next to Minor Doe—the Does have failed to establish the existence of a state-created danger.

### B.    *Monell* Liability Under § 1983

A school board may not be held liable under § 1983 on a theory of *respondeat superior* theory. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); *McQueen*, 433 F.3d at 470. Rather, a governmental entity is only responsible when its policy or custom was the "moving force" behind the asserted harm, or if the entity's "failure to train employees amounts to deliberate indifference to constitutional rights." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1977); *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 994 (6th Cir. 2017); *see Doe v. Claiborne Cty. ex rel. Clairborne Cty. Bd. of Educ.*, 103 F.3d 495, 505–06 (6th Cir. 1996). Moreover, to impose municipal liability, "it is necessary to show that [the municipality's] employees inflicted a constitutional harm." *McQueen*, 433 F.3d at 471 (quoting *Ewolski*, 287 F.3d at 516).

As discussed above, JLSD Employees did not inflict a constitutional harm because they did not act with the requisite culpability to increase the risk of harm from a third-party. "Because

the [Board] can only be held liable if there is a showing of liability on the part of its officials, the determination that the [JLSD Employees] did not violate [Minor Doe's] constitutional rights resolves the [*Monell*] claim against the [Board] as well." *Id*. at 471 (quoting *Bukowski v. Akron*, 326 F.3d 702, 712–13 (6th Cir. 2003)).

Further, the Does have failed to establish a policy or custom from which they could hold the Board liable. While they suggest that "[t]o say [the Board] has a policy of inadequate training and supervision is an understatement[,]" the record does not support such a claim. (Board MSJ Opp'n at 2393.) First, the Does proclaim that the JLSD individuals were "clearly aware of the potential for student-on-student sexual harassment as they have a general policy to separate boys from girls on their buses." (*Id*. at 2394.) From this they reason that "its decision to forgo training its employees on these issues was the result of its deliberate indifference to harmful, foreseeable consequences, i.e., peer on peer sexual assault, that could result from the lack of instruction and pupil management." (*Id*.) They conclude that "if Singleton had been properly trained and made aware of these safety issues/safety plan, he would not have permitted C.T. to sit with Minor Doe and would have, in turn, unequivocally prevented all of the sexual assaults from occurring to her." (*Id*.)

Such an analysis is steeped in speculation and relies entirely upon hindsight. The mere fact that a different course of action in this case might have prevented the unfortunate events that underlie this litigation does not support a finding of a district-wide policy or custom to encourage such events. A "custom" to establish municipal liability under § 1983 must "be so permanent and well settled as to constitute a custom or usage with the force of law." *Claiborne Cty*., 103 F.3d at 507 (quoting *Monell*, 436 U.S. at 691). "In turn, the notion of 'law' must include '[d]eeply

embedded traditional ways of carrying out state policy. It must reflect a course of action deliberately chosen from among various alternatives." *Id*. (internal citation omitted). "Proof of a single, isolated incident of misconduct by a nonpolicymaking employee is not sufficient to impose liability under *Monell* unless training or supervision was so reckless or grossly negligent that misconduct was almost inevitable or substantially certain to result." *Vinson v. Campell Cty. Fiscal Ct*., 820 F.2d 194, 200 (6th Cir. 1987) (quotation marks and footnote omitted); *see, e.g., Sargi*, 70 F.3d at 912 (finding no evidence from single incident that the school board affirmatively adopted a custom, practice, or policy of taking children suffering from seizures home without necessary medical intervention).

Moreover, the Does have failed to establish that the Board's failure to train Singleton on issues of identifying and preventing sexual harassment constituted deliberate indifference to a known or obvious risk to Minor Doe. Contrary to the Does' suggestion, there is nothing in the record to suggest that the Board's practice of encouraging bus drivers to group student riders by age and gender is grounded in a concern for peer-on-peer sexual assault.[7] The Does have produced no evidence of other incidents where permitting children of the opposite gender to sit together resulted in sexual assault, nor any evidence that Minor Doe's assault was inevitable because of inadequate training or supervision. *See Vinson*, 820 F.2d at 200.

### C.    Title IX

Title IX protects a student from "be[ing] excluded from participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination under any educational program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). An educational institution can be

held liable for student-on-student sexual harassment under Title IX only "when a student can demonstrate: (1) she suffered harassment so severe as to 'deprive [her] of access to . . . educational opportunities,' (2) the institution had actual knowledge of that harassment, and (3) the institution was 'deliberately indifferent' to the harassment." *M.D. ex rel. Deweese v. Bowling Green Indep. Sch. Dist.*, 709 F. App'x 775, 777 (6th Cir. 2017) (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 269, 650, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999)); *see also Hill v. Cundiff*, 797 F.3d 948, 970 (11th Cir. 2015) (breaking down the same standard into five elements).

Here, there is no question that the assaults on Minor Doe were sufficiently severe to satisfy the first element identified by the Sixth Circuit. *See Soper*, 195 F.3d at 855 (noting that sexual assault "obviously qualifies as being severe, pervasive, and objectively offensive"). It is also undisputed, however, that the Board did not have actual knowledge[8] of these assaults until Waltman received the email from the Does on November 12, 2016.[9] Its response to this knowledge was not, as a matter of law, deliberately indifferent.

A school is deemed deliberately indifferent to acts of student-on-student sexual assault or

---

[7] Neftzer testified simply that bus drivers are encouraged to group children by age and gender because older children may discuss topics that are not suited for younger children. (Neftzer Dep. at 514-15; *see* Neftzer Aff. ¶ 7.)

[8] Even though the Does have suggested that Singleton should have known about the assaults occurring on his bus, a position that stands contrary to the JTPD's investigation that found that he could not have seen C.T.'s misconduct, Singleton was not an "appropriate person" under Title IX. In *Gebser v. Lago Vista Indep. Sch. Dist.*, the Supreme Court held that a school district cannot be held liable for sexual harassment of a student by one of its teachers "unless an official who at a minimum has authority to address the alleged discrimination and institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." 524 U.S. at 290. Here it is undisputed that Singleton had no authority to discipline students, and there is nothing in the record to suggest that he had the authority to remediate sexual misconduct by students. Accordingly, any knowledge he had, or should have had, cannot be attributed to the Board.

[9] For the reasons set forth in the prior section of this memorandum opinion, the Court also finds that, prior to November 11, 2016, the Board was not deliberately indifferent to the *risk* that Minor Doe would be assaulted by C.T. *See Campbell v. Dundee Cmty. Schs.*, 661 F. App'x 884, 889 (6th Cir. 2016) ("If there was no notice to school officials of a risk of sexual harassment occurring, then there was no deliberate indifference toward that risk.")

harassment when its response or lack thereof is "clearly unreasonable in light of the known circumstances." *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 848 (6th Cir. 2016) (quotation marks omitted). This is a "high bar" and is not a "mere reasonableness" standard. *Id.*; *see Doe v. Sch. Bd. of Broward Cty.*, 604 F.3d 1248, 1259 (11th Cir. 2010) (deliberate indifference is an "exacting standard"). It is also a standard that is amenable to summary judgment, as "there is no reason why courts . . . [can]not identify a response as not 'clearly unreasonable' as a matter of law." *Stiles*, 819 F.3d at 848 (alternation in original) (quotation marks omitted).

Here, the Board acted quickly and decisively once Walton was aware of the assaults. School officials immediately launched an internal investigation by reviewing bus video footage and interviewing students, and school employees cooperated with the authorities as they conducted their separate investigation. C.T. was suspended immediately and, within a matter of days, expelled from school. He never rode the bus again after November 11, 2016, and he never again came into contact with Minor Doe. School officials also immediately met with the Does to address their concerns, arranged for counseling for Minor Doe, and continued to check on Minor Doe in the months that followed. This course of action was both swift and effective, in that it did not subject Minor Doe to any further sexual assaults. *See Davis*, 526 U.S. 645 ("[T]he deliberate indifference must, at a minimum, cause [students] to undergo harassment or make them liable or vulnerable to it.") (quotation marks omitted); *see, e.g., Pahseen*, 668 F.3d at 364 (No Title IX liability where the school district's response to sexual harassment and assault was "prompt, reasonable, and not deliberately indifferent"); *Soper*, 195 F.3d at 855 (finding the "prompt and thorough response by school officials" precluded a finding of deliberate indifference). The Board's response was not, as a matter of law, deliberately indifferent.

**D.      State Law Claims and Tort Immunity**

Section 2744 of the Ohio Revised Code extends to municipalities immunity from tort liability for governmental and propriety functions. Ohio Rev. Code § 2744.02(A)(1); *Chesher v. Neyer*, 477 F.3d 784, 796 (6th Cir. 2007). It is well settled that "government functions" include the act of providing a system of public education. *See* § 2744.01(C)(2)(c). There are, however, certain exceptions to the general grant of immunity spelled out in the statute. Specifically, § 2744.02(B) provides five instances where immunity is not available to a municipality: (1) injury or damage is caused by a municipal employee's negligent operation of a motor vehicle, (2) the losses are due to the negligent performance of employees with respect to proprietary functions of a political subdivision, (3) damages are the result of a municipality's negligent failure to keep public roads in repair, (4) damages are the result of a physical defect on the grounds of public buildings used for government functions, and (5) civil liability is expressly imposed by another provision of the Ohio Revised Code.

The Does suggest that the first exception—injury or damage caused by a municipal employee's negligent operation of a motor vehicle—applies to divest the Board of statutory immunity. *See* Ohio Rev. Code § 2744.02(B)(1). However, the Ohio Supreme Court has made clear that the statutory exception for the operation of a motor vehicle by a municipal employee "pertains only to negligence in driving or otherwise causing the vehicle to be moved." *Doe v. Marlington Local Sch. Dist. Bd. of Educ.*, 907 N.E.2d 706, 711 (Ohio 2009). In *Marlington*, as in this case, the district school board was sued when a student was sexually assaulted on a school bus by a fellow student. With respect to board liability, the court framed the question as follows:

> The issue in this case is whether a school bus driver's supervision of the conduct
> of children passengers on a school bus amounts to operating of a motor vehicle

within the statutory exception to political subdivision immunity under [Ohio Rev. Code §] 2744.02(B)(1).

*Id*. at 708. The Ohio Supreme Court answered the question in the negative, granting summary judgment to the school board, and specifically finding that the "language of [Ohio Rev. Code §] 2744.02(B)(1) is not so expansive that it includes supervising the conduct of student passengers. . . ." *Id*. at 711-12.

Notwithstanding the ruling in *Marlington*, the Does cite the unreported appellate decision of *Swain v. Cleveland Metro. Sch. Dist*., No. 94553, 2010 WL 3722280 (Ohio Ct. App. Sept. 23, 2010), in support of their position. In *Swain*, a kindergarten student fell asleep on the bus ride home from school. The bus driver failed to inspect his bus before returning the bus to the garage, and the sleeping child was left on the bus. The mother sued the school for damages. In denying statutory immunity on a motion to dismiss, the court distinguished *Marlington*, noting that "the conduct of the bus driver in the case at bar takes place in relation to her operation of the bus and the student, not the supervision of the *conduct* of the students on the bus as occurred in the sexual assault in *Marlington*." *Id*. at *2. While they acknowledge that their claims against the Board are premised, in part, upon "Singleton's complete failure to supervise C.T.[,]" the Does insist that their claims "also stem from [Singleton's] affirmative conduct of instructing C.T. to sit next to Minor Doe, in the seat directly behind him, without any ability to see what was going on in the seat." (Board MSJ Opp'n at 2401.)

While the Does focus on a single affirmative act of Singleton of placing the two children in the same seat, it was the conduct of C.T., undetected by Singleton, that caused Minor Doe's injuries, unlike the situation in *Swain* wherein the injury was caused by the bus driver's failure to inspect. The Ohio Supreme Court has clearly held that, for purposes of § 2744.02(B)(1),

operation of a motor vehicle does not include supervising the conduct of students, and, as a federal court reviewing a state statute, this Court is bound by that determination. *See, e.g., Doe v. Bath Local Sch. Dist.*, No. 1-14-12, 2014 WL 5802858, at *2-3 (Ohio Ct. App. Nov. 10, 2014) (relying on *Marlington* to find school immune from suit of minor sexually molested by another student on a school bus);[10] *but see N.A.D. v. Cleveland Metro. Sch. Dist.*, No. 97195, 2012 WL 5288769, at *5 (Ohio Ct. App. Oct. 25, 2012) (at motion to dismiss stage, complaint alleging that bus driver failed to *inspect* students resulted in student-on-student sexual assault was sufficient to defeat claim of statutory liability).

The Court finds that the Board qualifies for immunity under Ohio Rev. Code § 2744.02(A)(1), as its employees were engaged in the governmental function of providing a public education. Further, none of the five exceptions applies to the circumstances as they are known following discovery. Thus, to the extent that the municipality is sued under state law, it is entitled to immunity with respect to the Does' state tort claims. *See generally Hout v. Mansfield*, 550 F. Supp. 2d 701, 744 (N.D. Ohio 2008) ("Ohio courts have held that political subdivisions are entitled to immunity under § 2744.02 for the intentional torts committed by their employees.") (collecting cases). Moreover, because none of the Does' federal or state claims survive against the Board, their derivative claim of loss of consortium also fails. *See Bradley v. Sprenger Enters., Inc.*, No. 07CA009238, 2008 WL 1849649, at *3 (Ohio Ct. App. Apr. 28, 2008) (citing *Wang v. Goodyear Tire & Rubber Co.*, 587 N.E.2d 387 (Ohio Ct. App. 1990)).

---

[10] In *Bath*, the complaint alleged that a bus driver failed to follow protocol that required a seventeen-year old student with known danger tendencies to ride in a seat by himself and permitted the student to sit next to a much younger student, whom he repeatedly molested sexually. In attempting to distinguish *Marlington*, the plaintiff emphasized the school's affirmative decision to place a known violent teenager on a bus with elementary school students. Notwithstanding this factual distinction, the court found that the issue was indistinguishable from *Marlington* in that it still amounted to a failure to supervise claim. *Id.* at *2.

Because the Board is entitled to dismissal of the federal claims against it and is entitled to statutory immunity as to the state claims, the Board's motion for summary judgment is GRANTED in full.

## V. JLSD EMPLOYEES' SUMMARY JUDGMENT MOTION

Like the Board, JLSD Employees argue collectively that they are entitled to summary judgment on the federal claims raised against them under 42 U.S.C. § 1883 because the Does cannot establish the existence of a state-created danger.[11] Because the lack of a state-created danger prevents the Does from maintaining a constitutional claim against these defendants for injuries caused by a third-party actor, the Court agrees. *See generally, McQueen*, 433 F.3d at 463 (noting that a § 1983 claim requires the deprivation of a constitutional right). As discussed above, the Does have failed to identify evidence that would raise a genuine issue of material fact that JLSD Employees violated Minor Doe's substantive due process rights. For this reason, alone, JLSD Employees are entitled to qualified immunity.[12] *See, e.g., id.* at 470 (absent a state-created danger, individual school officials were entitled to summary judgment on substantive due process claims involving student-on-student violence); *Soper*, 195 F.3d at 853 (finding qualified immunity for school officials who were not responsible for a state-created danger to a mentally

---

[11] JLSD Employees also argue that they cannot be held individually liable because they have been sued only in their official capacities. It is true that the SAC does not specifically state that JLSD Employees have been sued in their individual capacities. However, even the case law relied upon by JLSD Employees provides that "[w]hen a § 1983 plaintiff fails to affirmatively plead capacity in the complaint, [the court may] look to the course of proceedings to determine whether" the plaintiff put the defendants on notice that they were sued in their individual capacities. *Moore v. City of Harriman*, 272 F.3d 769, 773 (6th Cir. 2001). Here, the SAC alleges that the JLSD Employees acted with malice. Moreover, the Does sought to hold "all Defendants" jointly and severally liable for compensatory damages. (SAC at 314.) Further, the Does' responses to JLSD Employee's summary judgment motion (*see* JLSD Employees MSJ Opp'n at 2617–18) makes clear that the JLSD Employees are being sued in their individual capacities. *See Moore*, 272 F.3d at 774.

[12] Before there can be supervisory liability under § 1983, there must be unconstitutional conduct by a subordinate employee. *See McQueen*, 433 F.3d at 470 ("a prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor").

disabled middle school student who was sexually assaulted by fellow students).

A. **Qualified Immunity**

However, even if the Court were to find a qualifying constitutional violation, JLSD Employees insist that they would still be entitled to qualified immunity from the federal claims. Once again, the Court agrees. The qualified immunity doctrine shields government officials performing discretionary actions from civil damages liability if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). "Qualified immunity provides [officials] 'breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law.'" *Mullins v. Cyranek*, 805 F.3d 760, 765 (6th Cir. 2015) (quoting *Stanton v. Sims*, 571 U.S. 3, 6, 134 S. Ct. 3, 187 L. Ed. 2d 341 (2013) (per curiam)). Qualified immunity will apply "'if [officials] of reasonable competence could disagree on the issue.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)); *see Ewolski*, 287 F.3d at 501 (qualified immunity will apply unless it is obvious that no reasonably competent official would have concluded that the action was lawful).

Courts employ a two-part test to determine if qualified immunity applies. First, courts determine whether the facts, taken in a light most favorable to the party alleging injury, show an official's conduct violated a constitutional right. *Ewolski*, 287 F.3d at 501; *see Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Second, if a constitutional right was violated, courts must determine "whether the violation involved a clearly established constitutional right of which a reasonable person would have known." *Peete v. Metro. Gov't of*

*Nashville & Davidson Cty.*, 486 F.3d 217, 219 (6th Cir. 2007) (quotation marks and citation omitted). If a plaintiff fails to establish either prong, he has failed to carry his burden, and judgment is appropriate for the defendant. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). Since the failure of either prong is dispositive in favor of a defendant, the Court may address either prong first.[13] *See Pearson*, 555 U.S. at 236.

The Supreme Court has recently reiterated earlier admonitions that "'clearly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, -- U.S. --, 137 S. Ct. 548, 552, 196 L. Ed. 2d 463 (2017) (per curiam) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011)). Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). "Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *Id.* (quoting *Anderson*, 563 U.S. at 639).

According to this directive, "a plaintiff must identify a case with a similar fact pattern that would have given 'fair and clear warning to [officials]' about what the law requires." *Arrington-Bey*, 858 F.3d at 993 (quoting *Pauly*, 137 S. Ct. at 552). Throughout the qualified immunity analysis, "[t]he 'dispositive inquiry . . . [remains] whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier*, 533 U.S. at 202).

---

[13] On some occasions, it may be necessary to employ a third step, which is whether the plaintiff "'offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" *Thacker v. Lawrence Cty.*, 182 F. App'x 464, 468 (6th Cir. 2006) (quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004)).

In determining whether a law is clearly established, this Court looks to decisions of the Supreme Court and the Sixth Circuit. *Carver v. City of Cincinnati*, 474 F.3d 283, 287 (6th Cir. 2007). If controlling authority does not establish the law, this Court may consider other circuit authority. *Andrews v. Hickman Cty.*, 700 F.3d 845, 853 (6th Cir. 2012). Although a prior case need not be directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. The clearly established prong will depend "substantially" on the level of generality at which the legal rule is identified. *Anderson*, 483 U.S. at 639. Again, the right must be clearly established in a particularized sense, and not in a general abstract sense. *Id*. at 640. "'This standard requires the courts to examine the asserted right at a relatively high level of specificity[,]' and 'on a fact-specific, case-by-case basis[.]'" *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011) (alterations in original) (quoting *Cope v. Heltsley*, 128 F.3d 452, 458–59 (6th Cir. 1997)).

With respect to the first prong, the Court has already determined that there was no "state-created danger," and, therefore, no constitutional violation for student-on-student sexual assault. However, even if the Does had established the existence of a constitutional violation, qualified immunity would protect the JLSD Employees because the rights at issue herein were not clearly established.

It is true that the general/abstract right to be free from student-on-student harassment is well established. *See Shively v. Green Local Sch. Dist. Bd. of Educ.*, 579 F. App'x 348, 356 (6th Cir. 2014). However, the Does fail to identify any controlling caselaw from the Sixth Circuit or the Supreme Court, or even persuasive authority from other jurisdictions, that would support a finding that JLSD Employees were on notice that the alleged unlawfulness of their conduct in the

mandated "particularized sense" was apparent or that they were "plainly incompetent" for failing to protect Minor Doe from the actions of CT. Specifically, they fail to identify any case wherein school officials were held responsible for failing to protect students from sexual harassment or sexual assault involving another student with no prior history of sexual misconduct. They also fail to identify any authority that would have alerted these officials to the possibility of liability for reported sexual assaults, notwithstanding immediate and effective efforts to remedy the situation. Under these circumstances, JLSD Employees would be entitled to qualified immunity on the federal claims.

B. **State Law Claims and Tort Immunity**

Ohio Rev. Code § 2744 also provides immunity for tort actions for employees of political subdivisions, provided their acts and omissions were not "manifestly outside the scope of the employee's employment or official responsibilities" or were taken "with malicious purpose, in bad faith, or in a wanton or reckless manner[.]" Ohio Rev. Code § 2744.03(A)(6)(b); *see Blankenship v. Enright*, 586 N.E.2d 1176 (Ohio Ct. App. 1990) (immunity for employees of political subdivisions for negligent and intentional torts). "Malice" is the "willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified." *Otero v. Wood*, 316 F. Supp. 2d 612, 629 (S.D. Ohio 2004) (citations omitted). "Bad faith" includes a "dishonest purpose, conscious wrongdoing, or breach of a known duty through some ulterior motive." *Id*. "Wanton misconduct" is defined as "the failure to exercise any care toward those to whom a duty of care is owned in circumstances in which there is a great probability that harm will result." *Anderson v. City of Massillon*, 983 N.E.2d 266, 273 (Ohio 2012) (citation omitted). "Reckless conduct" is "characterized by the conscious disregard of or

indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.* While the determination of "recklessness" is typically reserved for a jury, because the standard is high, summary judgment is appropriate "where the individual's conduct does not demonstrate a disposition to perversity." *O'Toole v. Denihan*, 889 N.E.2d 505, 517 (Ohio 2008).

The various individual defendants had different levels of involvement with the incidents involving C.T. and Minor Doe. Thus, it is important to consider the individuals' actions separately. *See, e.g., Vidovic v. Hoynes*, 29 N.E.3d 338, 348 (Ohio Ct. App. 2015). As previously discussed, Krieg, the dean of students, gathered information regarding allegations that C.T. lit a match on the school bus and reported the information to Waltman. She was not involved in the decision to assign C.T. to a front row seat on the bus. Neff, a guidance counselor, assisted Krieg in gathering information and had previously worked with C.T.'s third grade teacher in developing the "Success Plan." Waltman had received no complaints against C.T. until the match-lighting incident, though she was aware of the "Success Plan." She made the decision to move C.T.'s seat, after consultation with Neftzer. Neftzer previously received a complaint about Singleton's pupil management abilities prior to the events giving rise to this litigation. Finally, on at least one occasion, Singleton directed C.T. to sit next to Minor Doe, and he failed to detect the abuse that occurred on his bus.

The Does argue that Krieg and Neff "ignored" repeated instances of C.T.'s bullying, in addition to other serious misconduct. Viewing the evidence in a light most favorable to the Does, there is no doubt that C.T's prior conduct was serious. Still, there is nothing in the record that would support a finding that Krieg and Neff should have anticipated that C.T. would commit a

sexual assault on the bus if his seat was moved. *See also Williams v. Columbus Bd. of Educ.*, 610 N.E.2d 1175, 1178–79 (Ohio Ct. App. 1992) (school was entitled to statutory immunity for state torts where school officials could not have anticipated that students with history of fighting would sexually assault a female student).

As for Waltman and Neftzer, the Does essentially complain that they failed to impose the same stringent supervision requirements on the bus that were imposed in the school building. They suggest that better supervision on the bus would have prevented C.T.'s sexual attacks. While another plan may have been more effective, it cannot be said that either official acted in bad faith, maliciously, or recklessly. "Courts have not required schools to take perfect action to remedy [student misconduct] to avoid claims related to gross negligence, . . . but that they take some precautions or steps to recognize and address the issue." *Vidovic*, 29 N.E.3d at 349. Both individuals reacted to claims of student misconduct with a plan designed to address the problem, and they cannot be denied statutory immunity simply because the plan failed to protect Minor Doe from unanticipated consequences. There is no basis for withholding statutory immunity from these defendants.

As to the remaining individual defendant—Singleton—the Does argue that Singleton intentionally directed C.T. to sit next to Minor Doe. Even though Singleton took this action with knowledge of C.T.'s prior conduct involving the matching-lighting incident, there is nothing in the record that would have suggested that Singleton should have anticipated that C.T. would sexually assault Minor Doe or any other student in his immediate vicinity. While the consequences to Minor Doe were tragic, the Court cannot employ hindsight to find Singleton's conduct reckless. *See O'Toole*, 889 N.E.2d at 517 ("We must apply the law without

consideration of emotional ramifications and without the benefit of 20-20 hindsight.")

Ultimately, the Court is unable to find that any of the JLSD Employees acted in a manner that showed "a willful and intentional design to do injury without just cause . . . or a failure to exercise any care when the probability of harm is great[.]" *Mohat v. Horvath*, No. 2013-L-009, 2013 WL 5450296, at *4 (Ohio Ct. App. Sept. 30, 2013). The record simply does not support a finding that any of the JLSD Employees acted recklessly, in bad faith, or with malice. Therefore, JLSD Employees are entitled to statutory immunity on the Does' state law tort claims. Moreover, because these claims (as well as the federal claims) fail, the Does' derivative loss of consortium claim fails also. *See, e.g., Cook v. City of Cincinnati*, 658 N.E.2d 814, 821 (Ohio Ct. App. 1995) (dismissing loss of consortium claim after a grant of statutory tort immunity to police officers). JLSD Employees' summary judgment motion is GRANTED in full.

## VI. THE DOES' SUMMARY JUDGMENT MOTION

The Does also seek summary judgment against all defendants on their federal claims under 42 U.S.C. § 1983. Their request for summary judgment hinges upon the Court finding that the Board and JLSD Employees were responsible for a state-created danger. (Does MPSJ at 1578.) Specifically, the Does argue that defendants should have anticipated from C.T.'s past conduct that he was likely to sexually assault Minor Doe if his seat was moved to the front of the bus. However, as already discussed in depth above, the record—even when viewed in a light most favorable to the Does—and governing authority do not support the finding of a state-created danger.[14] Thus, the Does' summary judgment motion is DENIED.

---

[14] Many of the arguments raised in the Does' summary judgment motion are also dependent on the Does' characterization of the record. Of course, the Does are not entitled to have the record viewed in a light most favorable to them when seeking summary judgment. *See Profit Pet*, 603 F.3d at 312.

## VII.  Conclusion

What happened to Minor Doe aboard a JLSD bus was disturbing and most unfortunate. Yet, tragic as it was, it was not the result of a constitutional violation by the Board or JLSD Employees. Accordingly, for the foregoing reasons, the Does' summary judgment motion is DENIED, and the summary judgment motions of the Board and JLSD Employees are GRANTED. This case is dismissed.

**IT IS SO ORDERED**.


Dated: December 14, 2018

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**